RECEIVED IN CLERK'S OFFICE
U.S.D.C. Atlanta

APR 2 3 2003

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

APR 2 3 2003

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

PURDUE PHARMA L.P., P.F. )
LABORATORIES, INC., and )
THE PURDUE FREDERICK COMPANY )
)
     Plaintiffs, )
)
v. )
)
SOLVAY PHARMACEUTICALS, INC., )
)
     Defendant. )

CIVIL ACTION

NO. 1:02-CV-3162 (JEC)

Jury Trial Demanded

## AMENDED COMPLAINT

COMES NOW Plaintiffs Purdue Pharma L.P. ("Purdue"),

P.F. Laboratories, Inc. ("P.F. Labs."), and The Purdue Frederick

Company ("TPFC"), (collectively, "Plaintiffs"), and file this

Amended Complaint against Defendant Solvay Pharmaceuticals, Inc.

("Defendant"), hereby stating their claims, on knowledge with

regard to Plaintiffs' own acts and on information and belief as

to all other matters, as follows:

### Parties, Jurisdiction and Venue

1.

Purdue is a limited partnership organized and existing

under the laws of the State of Delaware. Purdue maintains its

executive offices and principal place of business in Stamford,

Connecticut. Purdue's business includes developing,

manufacturing, and selling pharmaceutical products.

2.

P.F. Labs. is a corporation organized and existing under the laws of the State of New Jersey.  P.F. Labs. maintains its executive offices and principal place of business in Totowa, New Jersey.  P.F. Labs.' business includes the manufacture of pharmaceutical products.

3.

TPFC is a corporation organized and existing under the laws of the State of New York.  TPFC maintains its executive offices and principal place of business in Stamford, Connecticut.  TPFC's business includes the marketing of pharmaceutical products.

4.

Purdue, TPFC, and P.F. Labs are associated companies. TPFC and P.F. Labs. are sister companies.  Among other things, TPFC markets pharmaceutical products for Purdue.  Among other things, P.F. Labs. manufactures pharmaceutical products for Purdue.

5.

Defendant is incorporated under the laws of the State of Georgia and maintains its principal place of business in Marietta, Georgia.  Defendant's business includes developing, manufacturing, and selling pharmaceutical products.  Defendant

- 2 -

is the successor-in-interest to Reid-Rowell and Reid-Provident Laboratories, collectively "Reid".

6.

The amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

7.

Jurisdiction and venue are proper in the United States District Court for the Northern District of Georgia pursuant to 28 U.S.C. § § 1332 and 1391.

## FACTS

8.

In or about November 1983, Reid submitted an Abbreviated New Drug Application or "ANDA" No. 88-584 to the U.S. Food and Drug Administration ("FDA"), seeking approval to manufacture and distribute a pharmaceutical preparation combining dihydrocodeine, acetaminophen, and caffeine (the "Product"). FDA approved ANDA No. 88-584 in or about March 1986. In or about 1986, Defendant acquired Reid and, among other things, all rights, title, and interest, concerning ANDA No. 88-584 were transferred to Defendant.

9.

Defendant thereafter manufactured the Product pursuant to that ANDA No. 88-584 (the "Solvay ANDA") and distributed and sold the Product under the trade name COMPAL®.

-3-

10.

In order to maintain FDA approval of the Solvay ANDA, Defendant was required from time to time to make submissions to FDA, including but not limited to, filing supplements and annual reports for the ANDA. Defendant also was required by federal law, FDA regulations, and standard, accepted practices in the industry to maintain complete and accurate records with respect to the product, its manufacture, and product testing, including with respect to product stability, regardless of whether those records were submitted to FDA. Defendant represented, in connection with its submissions to the FDA, that the submissions were based on laboratory testing and analyses performed by or on behalf of Defendant with respect to, among other things, the raw materials in the Product, intermediates of the Product, and the final Product. Defendant purported to perform these analyses in accordance with federal law, FDA regulations, and standard, accepted practices in the industry (including but not limited to Good Manufacturing Practices███████████). Among the analyses that

## The Parties' Relationship

11.

In 1992, Defendant entered into discussions with
Purdue concerning Purdue's potential acquisition of all of
Defendant's rights, title, and interest in the Product,
including the Solvay ANDA, and the right to distribute and sell
the Product under that ANDA.  In the course of those
discussions, Purdue made Defendant aware that, if Purdue
acquired the Product from Defendant, Purdue intended that it and
its associated companies would invest substantial amounts of
money and time (and incur substantial additional indirect costs)
in order, among other things, to create or acquire facilities to
manufacture the Product, to perform such testing and analyses as
may be required, by the FDA or otherwise, and to obtain all
necessary FDA and other governmental approvals for such a
facility and for distributing and selling the product.
Defendant was further aware that Purdue intended to vigorously
promote and market the Product vigorously and that Purdue would
incur substantial direct and indirect costs, and invest Purdue's
good will, in connection with marketing the Product.  Defendant
also knew that P.F. Labs. would undertake to develop
manufacturing processes and would manufacture the product and
that TPFC would label and distribute the product.

12.

In November, 1992, Defendant and Purdue simultaneously entered into a written Purchase Agreement and a written Supply Agreement (collectively, the "Agreements") providing for, among other things, Purdue's purchase from Defendant, of all rights associated with the Product.  (The Supply Agreement is expressly incorporated by reference in the Purchase Agreement.)   The Agreements were made effective as of November 11, 1992.   Copies of the Purchase Agreement and the Supply Agreement are attached hereto as Exhibits "A" and "B", respectively.

13.

Under the Agreements, Defendant agreed, among other things, to sell to Purdue all of Defendant's rights, title and interest in the Product, and in the manufacture, and use of the Product, including but not limited to: (1) ANDA 88-584 and all other registrations, certifications, approvals, or correspondence from FDA relating to the Product; (2) all know-how, trade secrets, processes, formulas, specifications, and technical data relating to the manufacture, distribution, sale or use of the Product; (3) the registered and common law trademarks relating to the Product or its ingredients, along with the goodwill symbolized thereby; and (4) all information and data relating to finished product and raw material toxicology, stability, safety and efficacy.   In exchange, Purdue

agreed to pay Defendant $750,000 in connection with the closing

under the Agreements, and subsequently pay additional amounts,

as specified in the Agreements, as royalties based on "Net

Sales" (as defined in the Purchase Agreement) of the Product by

Purdue or its "Affiliates" (also defined in the Purchase

Agreement).

14.

The parties also agreed, in the Agreements, that

Defendant would manufacture for Purdue all of Purdue's

requirements of the Product for an interim period of at least

six months and up to approximately one year after the closing of

the Agreements, and that Purdue would purchase its requirements

of the Product from Defendant during that interim period.

15.

In the Agreements, Defendant made numerous express

representations and warranties to Purdue, including that:

(1)   "[Defendant] has not done any acts and does not

know of any circumstances which are inconsistent with the terms

or intent of this Agreement or infringe on the rights of

[Purdue]";

(2)   Defendant had "not received or does not know of

any notice or communication from FDA . . . which in any way

adversely affects the Product or its manufacture or use";

(3)   There is no "proceeding, investigation or claim pending or, to the knowledge of [Defendant], threatened against [Defendant] concerning or in any way affecting the Product";

(4)   Defendant had "all government approvals necessary to manufacture Product for sale or use in the United States";

(5)   Defendant would "manufacture [the Product] in a facility which complies with United States Good Manufacturing Practices and which is certified by the FDA";

(6)   "All Product supplied to Purdue shall be produced in accordance with Good Manufacturing Practice Regulations issued by the FDA . . . as well as [Solvay ANDA]";

(7)   "All Product supplied to Purdue . . . will . . . comply with the specifications set forth in Exhibit A [to the agreement] and will not be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act"; and

(8)   Defendant knew of "no specific circumstances that would prevent or limit [the] manufacture, sale or use" of the Product in the United States.

16.

In the Agreements, Defendant further agreed to indemnify and hold Purdue harmless from and against, among other things, any loss, liability, damage or expense (including, but not limited to, reasonable attorneys' fees) based upon, arising out of, or resulting from any inaccuracy in any warranty or

- 8 -

covenant under the Agreements or any breach of any warranty or

covenant under the Agreements.  Defendant also agreed to give

Purdue "prompt notice" of "any FDA or other governmental action

17.

Defendant further expressly agreed, in the Agreements,

that Defendant's representations and warranties "are true and

shall remain true during the term of the Agreement" and that

Defendant's warranties and representations, as well as its

indemnification and "prompt notice" obligations, would survive

representations and warranties, including without limitation,
that Defendant "had had all necessary government approvals to
manufacture, sell, and use the Product in the United States",
knew of "no specific circumstances that would prevent or limit
[the] manufacture, sale or use" of the Product, and had not done
anything to compromise Purdue's rights under the Agreements or
the obvious intent of the Agreements, were (along with the other
representations and warranties) material to the Agreements.
Defendant knew that, in entering into the Agreements and in
subsequently investing funds, time and other resources in
connection with the Product, Purdue and its associated entities
would be relying on each and all of the representations and
warranties by Defendant.  P.F. Labs. and TPFC were intended
third-party beneficiaries of the Agreements.

19.

Prior to closing the Agreements with Defendant, Purdue
took all reasonable steps under the circumstances to investigate
Defendant's rights, title, and interest in the Product,
including the validity of the ANDA and the integrity of the
information alleged to support the ANDA and other submissions to
FDA.  As a result of Purdue's due diligence, Purdue had a good
faith belief that Defendant possessed and had the right to
transfer to Purdue a valid and unblemished ANDA for the Product
and that the data and other information that Defendant had

provided to FDA in support of ANDA 88-584 was obtained through
reliable scientific methods and reported in a complete,
accurate, and reliable manner.

20.

Pursuant to the Agreements, Purdue paid Defendant
$750,000 for the purchase of all rights, titles, and interest in
the Product, and as advance royalties, at the closing of the
Agreements.  In 1993, Purdue began selling the Product under a
new trademark, DHC Plus®.  Purdue also fulfilled its obligations
under the Agreements by purchasing its requirements of the
Product from Defendant from approximately March through
approximately November 1993.  During this time, and during the
following several years, Purdue and the other plaintiffs
incurred many millions of dollars in direct and indirect costs
in the manufacture, testing, promotion, and distribution of the
Product.  Purdue also paid defendant additional amounts
(approximately $35,346) as royalties pursuant to the Agreements.

21.

Defendant was aware that, in making each and all of
these payments and investments relating to the Product, Purdue
and the other plaintiffs were relying on both express and
implied representations from Defendant made in and in connection
with the Agreements, including, without limitation, that
Defendant had not done anything and did not know of any

- 11 -

circumstances that would be inconsistent with the terms or intent of the Agreements or infringe on the rights Purdue was acquiring from Defendant, and that Defendant had not engaged in any acts, and did not know of any actions having been taken by others, that could affect the integrity and validity of the ANDA for the Product.  For more than eight years after it signed the Agreements in November 1992, Defendant did nothing to inform Plaintiffs that any of those representations and warranties were incorrect, nor otherwise to modify or correct those representations and warranties.

<div align="center"><b><u>Revelations Concerning the FDA Inquiry</u></b></div>

<div align="center">22.</div>

On or about February 27, 2001, Defendant shocked Plaintiffs by disclosing to Plaintiffs, for the first time, that Defendant had identified issues of "potential falsification of data [by Defendant], including selective reporting, data manipulation, and improper practices during the period from 1986 to 1992" relating to the Product.  In a phone call and letter, dated February 27, 2001, to Purdue, a certain Senior Attorney employed by and representing Defendant indicated that FDA had invoked that agency's Application Integrity Policy ("AIP") with respect to Defendant, that Defendant allegedly was in the process of "working through" the AIP, and that this process included a comprehensive assessment of the validity of the data

<div align="center">- 12 -</div>

in Defendant's submissions to FDA, including its submissions
with respect to the Product.

23.

In that February 27, 2001 letter, Defendant further
disclosed to Purdue, for the first time, that a limited audit of
data and submissions with respect to the Product had been
performed on behalf of Defendant (and in response to the FDA's
invocation of its AIP). However, Defendant did not provide
Purdue with a copy of any communications that Defendant had had
with FDA with respect to the Product, nor with a copy of the
results of the limited audit. Rather, in a clear attempt to
deter and debar Purdue from initiating any action against
Defendant, Defendant stated that it would not provide a copy of
the audit report to Purdue unless Purdue first agreed to: (1)
keep the report confidential; (2) use the report "only for
analyzing and making decisions with respect to the [P]roduct";
and (3) limit distribution of the report to Purdue's "employees
and consultants who have a need to know the information for
purposes of the analysis and decision-making process" with
respect to the Product.

24.

Defendant also attempted to mislead Purdue about the
results of the limited audit in a further attempt to downplay
the materiality of Defendant's misconduct and to dissuade Purdue

from taking any action.  Thus, Defendant falsely represented

that the limited audit had identified only "potential"

falsification of data affecting the Product.

25.

In a letter dated March 21, 2001, Purdue demanded that

Defendant provide Purdue with complete information concerning

any potential falsification of data or other improper practices

relating to ANDA 88-584 or any other submissions to or

correspondence with FDA concerning the Product.  Purdue flatly

rejected Defendant's attempt to limit Purdue's use of such

information, which Defendant was obliged to provide to Purdue

under the Agreements.  Purdue also reminded Defendant - although

it was already plain from the Agreements - that Defendant had no

right to take any action or make any representations to FDA with

respect to ANDA 88-584 or the Product.

26.

Defendant's response to Purdue's rightful demand for

all information with respect to any internal or FDA inquiries

concerning the Product was more dissembling.  On or about April

18, 2001, Defendant sent Purdue a portion of a document entitled

"Final Report of Limited Audit of Stability Data, ANDA 88-584

COMPAL® (or DHC Plus® Capsules)", dated January 29, 2001,

submitted by Biotechnical Services, Inc.  (the "Limited Audit

Report"). The document sent to Purdue appears to be incomplete on its face (it contains only 69 out of 549 listed pages).

27.

Even in providing the incomplete copy of the report, Defendant continued to try to mislead Purdue about the relevant facts in order to deter Purdue from taking any action against Defendant. In the letter, dated April 13, 2001, that accompanied the incomplete copy of the Limited Audit Report, Defendant represented: (1) that Defendant was unaware of problems with the COMPAL® application until after it had received a draft of the Limited Audit Report; (2) that Defendant had not received the draft and report until January 2001; and (3) that Defendant was in the process of reviewing and commenting on the draft report when it contacted Purdue in late February, 2001. Each of those representations was false and/or materially misleading. Defendant deliberately made those false and misleading representations to deceive Purdue into believing, inter alia, that Defendant had given Purdue timely notice of the FDA inquiry concerning the Product and of Defendant's knowledge of the falsification of data reported to the FDA in relation to the Defendant ANDA. Defendant also represented, again falsely and with intent to deceive Purdue, that Defendant had no discussions with FDA about the Product and that FDA had taken no action concerning the Product.

28.

Even the small portion of the Limited Audit Report furnished to Purdue in April, 2001, however, contradicts [redacted]

Defendant's representations, it appears from the Limited Audit Report that:

(1) Defendant was aware, prior to August 1997, that FDA was invoking its AIP policies with respect to data Defendant had reported to the FDA in relation to, inter alia, the Solvay

from Purdue from 1997 to 2001.  Even now, Defendant continues improperly to withhold from Purdue the full report, as well as other communications with FDA with respect to the AIP process and the audit. Defendant has done so with the intent to deceive Purdue and to deter and hinder any efforts by Purdue to seek redress from the courts for the inquiries caused by Defendant's fraud breaches of the Agreements and other wrongful acts.

## Findings of the Incomplete Limited Audit Report

30.

Even the small fragment of the Limited Audit Report that Defendant provided to Purdue shows that, at and before the time that the Agreements were executed, Defendant had knowledge of information and circumstances which materially, adversely affected the value of any rights and interest in the Product, and that Defendant had concealed that information from Purdue both before and at the time of the execution of the Agreements and for years thereafter.

31.

For example, according to the Limited Audit Report, the audit uncovered not mere "potential" falsification and manipulation of data, but actual "[s]elective reporting, data manipulation, and improper practices".  Moreover, the auditors found not just isolated instances of improper conduct, but a

systemic lack of integrity in Defendant's data collection,
analysis, and reporting procedures.

32.

As a further example, according to the Limited Audit
Report, selective reporting was manifested in Defendant's
failure to report data for whole batches, as well as in
Defendant's failure to report failing or low data from selected
batches.  The report also states that Defendant manipulated data
by, among other things, voiding results from certain lots and
filling in the missing results from one lot with relabeled
results from another.  The audit also found that Defendant
apparently used improper, invalidated standards and methods to
obtain certain desired - but false - test results.  The auditors
found instances in which tests with failing values were reported
as having passing values and other instances in which values for
one type of test were misrepresented as the results of another
test.

33.

The auditors also found that the improper practices
corrupted even the most basic aspects of Defendant's analytical
processes underlying its submissions for the Solvay ANDA,
including the use of expired, outdated materials, the lack of
standard documentation, and what appeared to be unjustified and
highly suspect alterations to calculations.

34.

According to the auditors, Defendant's improper practices infected many types of data submitted by Defendant to the FDA with respect to the Product, including stability data, dissolution assays, and potency assays. These improper practices apparently were known to and condoned by laboratory supervisors and other officials of Defendant.

35.

The auditors also found, and noted in the Limited Audit Report, that the fraud and other improper practices by Defendant and its predecessors had taken place at times prior to 1992 (i.e., prior to the time that Defendant and Purdue had entered into the Agreements). The auditors concluded -- and expressly stated in the Limited Audit Report -- that the impropriety of Defendant's conduct was so serious and so pervasive that it "undermines the validity data reported to the [Solvay ANDA] ANDA 88-584 in support of supplements and annual reports" submitted to FDA.

36.

Defendant's Limited Audit Report also included an admission that Defendant's record keeping "system" was such that, unless one already had a suspicion that there was data manipulation and improper practices being practiced, the systemic and systematic nature of the fraudulent and selective

reporting and misreporting of data could not reasonably be discovered by a third-party.  The Limited Audit Report reported, for example, that tests and assays performed by or on behalf of Defendant were not routinely documented in laboratory notebooks, making it easy for Defendant to hide instances in which only favorable results were selectively reported.  The auditors' ability to track tests and results was further hampered by the fact that Defendant recorded test results on unnumbered forms, such that a form documenting an unfavorable test could be thrown away without detection.  In other instances, Defendant's auditors admitted that Defendant had failed to preserve the raw data necessary to see whether tests results were being reported completely, accurately, and truthfully.

37.

Thus, it is readily apparent from the Limited Audit Report that Purdue could not reasonably have anticipated the nature or extent of the corruption of Defendant's data and could not have uncovered Defendant's fraud through the reasonable investigation that Purdue dutifully conducted prior to the closing under the Agreements.  Indeed, it had taken Defendant's auditors more than three years to perform even the limited audit reflected in the Limited Audit Report, and to prepare the report.  The Limited Audit Report, moreover, detailed some of the extraordinary lengths to which the auditors had to go to

uncover the fraud and manipulation that pervaded Defendant's
record-keeping and reporting practices with respect to the
Product.  During their investigation of the data collection,
analysis, and reporting procedures with respect to the Product,
the auditors also had the benefit of the knowledge they gained
about Defendant's fraud and manipulation with respect to other
products and reports.  And even with all this knowledge and
time, the auditors surmised that there were many instances of
fraud and data manipulation with respect to the Product that
they were not able to uncover because of the deficient and
deliberately fraudulent manner in which Solvay maintained its
laboratory records.

## Ramifications of the Auditors' Findings

38.

The fraud, manipulation, improper practices, and
fundamental lack of integrity that infected Defendant's data and
FDA submissions, unquestionably have a serious negative impact
on the Solvay ANDA, on the related rights that Defendant sold to
Purdue, and on the value of those rights today.

39.

Had Purdue known that the Solvay ANDA had even
potentially been tainted by the submission of falsified or
unreliable data, Purdue would not have entered into the
Agreements with Defendant, nor would Purdue have expended any

- 21 -

significant resources in evaluating and negotiating the purchase of the rights to the Product, much less have invested tens of millions of dollars in the manufacture and promotion of the Product.

40.

In addition, the development and implementation of the process for manufacturing the Product in the Purdue associated facilities may have been delayed and/or made more difficult, complicated, or expensive as a result of falsified data provided by Defendant.

## CLAIMS FOR RELIEF

### COUNT I: RESCISSION

41.

Plaintiffs hereby incorporate the allegations contained in Paragraphs 1 through 37 of this Complaint as if fully set forth herein.

42.

Plaintiffs request that the Court rescind the Agreements as Purdue was fraudulently induced to enter into the Agreements.

43.

Defendant misrepresented to Purdue certain material facts in an effort to induce Purdue to enter into the Agreements. Namely, Defendant made many representations and

warranties to Purdue as the parties were negotiating the Agreements, indicating, among other things, that the Product was in full FDA compliance, that Defendant had done nothing that was inconsistent with the rights under the Agreements, that all products supplied to Purdue would be in compliance with the FDA, that all government approval necessary to manufacture and sale the product was valid, and that Defendant was aware of no circumstances that would prevent or limit the manufacture or sale of the Product in the United States. These representations were wholly false.

44.

Defendant made these misrepresentations, with knowledge that the representations were false or with reckless disregard of the truth thereof.

45.

Defendant intended to and did deceive Plaintiffs with these misrepresentations.

46.

Plaintiffs acted upon these misrepresentations in reasonable reliance upon their veracity, in that Purdue would not have entered into the Agreements with Defendant had Plaintiffs known that the submissions contained falsified or unreliable data.

47.

As a proximate result thereof, Purdue is damaged by the loss of the $785,346 Purdue paid to Defendant under the Agreements.  Further, as a proximate result of entering into the Agreements, Plaintiffs incurred substantial direct and indirect costs in an amount to be proven at trial, in promoting, marketing, manufacturing and distributing the Product.

48.

Purdue promptly made an offer to restore to Defendant whatever benefits Purdue has received under the Agreements in return for the amounts paid to Purdue by Defendants pursuant to the Agreements, and for the costs incurred by Purdue in promoting, marketing, manufacturing and distributing the Product.  Defendant rejected this offer.

## COUNT II: FRAUD

49.

Plaintiffs hereby incorporate the allegations contained in Paragraphs 1 through 45 of this Complaint as if fully set forth herein.

50.

Defendant made the above-mentioned material misrepresentations to Plaintiffs.  As stated above, these material representations were wholly false.

51.

Those material representations were known by Defendant to be false.

52.

Defendant intended to and did deceive Plaintiffs with those material misrepresentations.

53.

Plaintiffs believed and reasonably relied upon the false material representations.  Thus, Purdue was induced to enter into the Agreements with Defendant.  Purdue would not have entered into the Agreements had Plaintiffs known that the submissions to the FDA contained falsified or unreliable data.

54.

As a proximate result of the foregoing, Plaintiffs have been injured and seeks to recover consequential and punitive damages, and attorneys' fees and costs of litigation, in an amount to be proven at trial of this action.

**COURT III: NEGLIGENT MISREPRESENTATIONS**

55.

Plaintiffs hereby incorporate the allegations contained in Paragraphs 1 through 51 of this Complaint as if fully set forth herein.

56.

Even if Defendant did not intend to deceive
Plaintiffs, the above-mentioned material misrepresentations made
by Defendant to Plaintiffs were at the very least a negligent
supply of false information.

57.

When Defendant made this negligent supply of false
information to Plaintiffs, each of Purdue, P.F. Labs., and TPFC
was a foreseeable and known party.

58.

As stated above, Plaintiffs believed and reasonably
relied upon the false material representations.   Thus, Purdue
was induced to enter into the Agreements with Defendant.   Purdue
would not have entered into the Agreements had Plaintiffs known
that the submissions to the FDA contained falsified or
unreliable data.

59.

As a proximate result of Defendant's
misrepresentations, Plaintiffs have been injured and seek to
recover consequential and punitive damages, and attorneys' fees
and costs of litigation, in an amount to be proven at trial of
this action.

## COUNT IV: BREACH OF CONTRACT (Breach of Warranties)

60.

Plaintiffs hereby incorporate the allegations contained in Paragraphs 1 through 56 of this Complaint as if fully set forth herein.

61.

Under the terms of the Agreements, Defendant made various representation and warranties to Purdue, including, without limitation, the representations and warranties specified in paragraphs 12-14 of this Complaint, as to which TPFC and P.F. Labs. were intended, third-party beneficiaries.

62.

Specifically, among other things, Defendant warranted under the Agreements that it had not engaged in any acts and did not know of any circumstances which were inconsistent with the terms or intent of the Agreements.

63.

Defendant made submissions to the FDA that contained falsified or unreliable data prior to entering into the Agreements with Purdue.

64.

Defendant breached the Agreements because its falsified and unreliable submissions to the FDA were entirely inconsistent with the terms and intent of the Agreements.

- 27 -

in December 2000.  Lastly, the final version of the Limited
Audit Report was signed in January 2001.  Throughout this period
from August 1997 through January 2001, Defendant engaged in
communications with the FDA concerning the Product.

69.

Despite these material developments regarding the
Product and Defendant's knowledge thereof, Defendant failed to
provide any notice to Plaintiffs of these developments until
February 2001.

70.

Even after Defendant provided notice of the above-
mentioned developments in February 2001, Defendant failed to
fully disclose all the information regarding the Product and the
FDA's relevant actions, and Defendant's communications with the
FDA concerning the Product.  Defendant withheld and continues to
withhold from Plaintiffs the complete Limited Audit Report and
material communications between Defendant and FDA regarding the
AIP process and audit with respect to the Product.

71.

Accordingly, Defendant breached the Agreements by
failing to promptly notify Plaintiffs of the above-mentioned
developments regarding the Product and by failing to fully
disclose those developments when Defendant finally provided
Plaintiffs with untimely notice.

72.

Plaintiffs have been injured as a result of Defendant's breach of the notification provision of the Agreements, and seeks to recover consequential damages and attorneys' fees and costs of litigation, in an amount to be proven at trial.

## COUNT VI: BREACH OF CONTRACT (Breach of Indemnification Provisions)

73.

Plaintiffs hereby incorporate the allegations contained in Paragraphs 1 through 69 of this Complaint as if fully set forth herein.

74.

Under the terms of the Agreements, Defendant agreed to "hold [Purdue] harmless from and against any loss, liability, damage or expense (including, but not limited to, reasonable attorneys' fees) based upon, arising out of or otherwise resulting from [] any inaccuracy or any breach of any warranty or covenant of the [Defendant] contained in this Agreement or in any certificate or instrument delivered by it pursuant to this Agreement."

75.

Defendant has provided inaccurate information to Plaintiffs and has breached several warranties and covenants

contained in the Agreements.  Accordingly, pursuant to the Agreements, Defendant has an obligation to indemnify and hold harmless Plaintiffs from the losses, liability, damages and expenses that they have incurred and continues to incur as a result of Defendant's omissions and breaches of the Agreements.

76.

Defendant has refused to comply with its obligation to indemnify and hold Plaintiffs harmless.

77.

Plaintiffs have been injured as a result of Defendant's breach of the indemnification provision of the Agreements, and seek to recover consequential damages and attorneys' fees and costs of litigation, in an amount to be proven at trial.

**COUNT VII: BREACH OF CONTRACT (Breach of Termination Provisions)**

78.

Plaintiffs hereby incorporate the allegations contained in Paragraphs 1 through 74 of this Complaint as if fully set forth herein.

79.

Under the terms of the Agreements' "Termination" provision, if a party materially breaches, materially defaults, or otherwise materially fails to perform the terms of the Agreement, or if a party's representations and warranties are

materially not true, "the other party may cancel [the

Agreements] by giving thirty (30) day's written notice thereof,

which notice shall indicate the basis for such cancellation."

If the breaching party fails to cure the breach, default,

failure of performance or representation within thirty (30) days

after the receipt of the notice, then the termination is

effective.  Pursuant to the Purchase Agreement, if the Agreement

is terminated by Purdue because of a breach, Defendant "shall

immediately return to Buyer all payments made by Buyer under

this [Purchase] Agreement."

80.

Purdue has notified Defendant in writing that it is

canceling the Agreements.  Defendant's materially false

representations and warranties, which are the basis for that

cancellation, have not been cured and, by their nature, could

not be cured.

81.

Because the Agreements are being effectively

terminated, Defendant had an obligation to "immediately return

to [Purdue] all payments made by [Purdue] under the [the

Agreements]".

82.

As a result of that termination, Defendant is also

breaching the Agreements by not, as required by the Agreements,

remitting to Purdue all payments made by Purdue under the Agreements.

83.

Plaintiffs have been injured as a result of Defendant's breach of the Agreements' termination provisions, and seek to recover consequential damages, including the $785,346 Purdue paid to the Defendant under the Agreements, and attorneys' fees and costs of litigation, in an amount to be proven at trial.

## COUNT VIII:   UNJUST ENRICHMENT

84.

Plaintiffs hereby incorporate the allegations contained in Paragraphs 1 through 80 of this Complaint as if fully set forth herein.

85.

As described above, Defendant unjustly received $785,346 from Purdue while Purdue did not receive the benefits of its bargain with Defendant.

86.

It would be inequitable and unjust to allow Defendant to retain the monies that Purdue paid to Defendant.

## COUNT IX: CONNECTICUT UNFAIR TRADE PRACTICES ACT (CONN. GEN. STAT. § 42-110, et seq. (2001))

87.

Plaintiffs hereby incorporate the allegations contained in Paragraphs 1 through 80 of this Complaint as if fully set forth herein.

88.

Defendant and Purdue were engaged in the conduct of trade and commerce when they entered into the Agreements.

89.

Defendant misrepresented to Plaintiffs certain material facts in order to induce Purdue to enter into the Agreements, namely that the Product was in full FDA compliance, that Defendant had done nothing that was inconsistent with the rights being transferred under the Agreements, that all products supplied to Purdue would be in compliance with the FDA, that all government approval necessary to manufacture and sale the product was valid, and that Defendant was aware of no circumstances that would prevent or limit the manufacture or sale of the Product in the United States.  These representations were wholly false.

90.

The material misrepresentations by Defendant to Plaintiffs were unfair and deceptive.

91.

The material misrepresentations made by Defendant to Plaintiffs were unlawful, offend public policy and are immoral, unethical, oppressive, and unscrupulous.

92.

The material misrepresentation made by Defendant constitute an unfair business practice that caused substantial injury to Plaintiffs, which injury is not outweighed by any possible benefits to consumers nor could the injury have been reasonably avoided.

93.

Plaintiffs have been substantially injured by Defendant's unfair business conduct and seek to recover consequential damages and attorneys' fees and costs of litigation, in an amount to be proven at trial.

94.

Plaintiffs also seek to recover punitive damages to punish Defendant's use of unfair business practices.

**COUNT X: PUNITIVE DAMAGES**

95.

Plaintiffs hereby incorporate the allegations contained in Paragraphs 1 through 88 of this Complaint as if fully set forth herein.

- 35 -

96.

As described above, Plaintiffs have been damaged by Defendant's violation of Conn. Gen. Stat. § 42-110, et seq. (2001). Plaintiffs are entitled to punitive damages under Conn. Gen. Stat. § 42-110(g).

97.

In addition, Defendant's actions as described above demonstrate willful misconduct, fraud, wantonness, and/or an entire want of care that raises the presumption of conscious indifference and consequences. Defendant's actions have shown a criminal indifference to their obligations to Plaintiffs and to the public generally.

98.

Defendant's actions as described above warrant an award of punitive damages. Such an award is necessary to deter Defendant from engaging in such tortuous conduct in the future.

**COUNT XI: ATTORNEYS' FEES AND EXPENSES**

99.

Plaintiffs hereby incorporate the allegations contained in Paragraphs 1 through 92 of this Complaint as if fully set forth herein.

100.

As described above, Plaintiffs have been damaged by Defendant's violation of Conn. Gen. Stat. § 42-110, et seq.



reasonable attorneys' fees, under Conn. Gen. Stat. § 42-110(g).

101.

Defendant has acted in bad faith, been stubbornly litigious and has caused Plaintiffs unnecessary trouble and expense by refusing offers of restoration by Purdue.

102.

Plaintiffs should be awarded all costs incurred for pursuing this lawsuit, including reasonable attorneys' fees.

**<u>PRAYER FOR RELIEF</u>**

Plaintiffs demand that judgment be entered in their favor as follows:

1.   Restitution damages of $785,346 plus the costs Plaintiffs incurred in promoting, marketing, manufacturing and distributing the product, consequential damages, pre-judgment interest, and attorneys' fees and costs of litigation, in an amount to be proven at trial;

## PLAINTIFFS DEMAND TRIAL BY JURY

This 18th day of April, 2003.

EDWIN M. BAUM
JENNIFER R. SCULLION
SOLOMON, ZAUDERER, ELLENHORN
FRISCHER & SHARP
45 Rockefeller Plaza
New York, New York 10111

DANIEL S. REINHARDT
Georgia Bar No. 600350
TROUTMAN SANDERS LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000 (voice)
(404) 885-3995 (facsimile)

Attorneys for Plaintiffs
Purdue Pharma L.P.,
P.F. Laboratories, Inc.,
and The Purdue Frederick
Company

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| PURDUE PHARMA L.P., | 02-CV-3162 (JEC) |
| Plaintiff, | |
| v. | |
| SOLVAY PHARMACEUTICALS, INC., | |
| Defendant. | |

I, Jennifer R. Scullion, hereby certify that on

April 18, 2003, I caused to be served by U.S. mail true

and correct copies of the foregoing **Amended Complaint** the

following:

John W. Harbin, Esq.
R. Brent Hatcher, Esq.
POWELL, GOLDSTEIN, FRAZER &
MURPHY LLP
191 Peachtree Street, NE
16th Floor
Atlanta, Georgia 30303
(404) 572-6600
(404) 572-6999 (fax)

James D. Robenalt, Esq.
Brian E. Roof, Esq.
THOMPSON HINE
3900 Key Center
127 Public Square
Cleveland, Ohio 44114
(216) 566-5500
(216) 566-5800 (fax)

Dated:  April 18, 2003

Jennifer R. Scullion